IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | |
|---|---|
| MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, THOMAS PLUNKETT, ROD WOULLARD, and HOLLIS WATKINS, on behalf of themselves and all other similarly situated | **PLAINTIFFS** |
| v. | NO. 3:11-cv-159 TSL-EGJ-LG |
| HALEY BARBOUR, in his official capacity as Governor of the State of Mississippi, JIM HOOD, in his official capacity as Attorney General of the State of Mississippi, and DELBERT HOSEMANN, in his official capacity as Secretary of State of the State of Mississippi, as members of the State Board of Election Commissioners; THE MISSISSIPPI REPUBLICAN PARTY EXECUTIVE COMMITTEE; THE MISSISSIPPI DEMOCRATIC PARTY EXECUTIVE COMMITTEE; and CONNIE COCHRAN, in her official Capacity as Chairman of the Hinds County, Mississippi Board of Election Commissioners, on behalf of herself and all others similarly situated | **DEFENDANTS** |
| and | |
| APPORTIONMENT AND ELECTIONS COMMITTEE OF THE MISSISSIPPI HOUSE OF REPRESENTATIVES; MISSISSIPPI STATE SENATE DEMOCRATIC CAUCUS AND STATE DEMOCRATIC SENATORS, in their individual capacities; TERRY C. BURTON, SIDNEY BONDURANT, BECKY CURRIE and MARY ANN STEVENS | **INTERVENORS** |

---

**RESPONSE OF THE MISSISSIPPI REPUBLICAN PARTY EXECUTIVE
COMMITTEE TO THE COURT'S APRIL 29 ORDER AND NOTICE**

---

On April 29, the Court entered an Order indicating that unless the Legislature fulfilled its

obligation to redistrict itself, the Court was "inclined to issue an order" requiring the State to

hold its 2011 elections under plans that the Mississippi Legislature considered but did not enact during its 2011 regular session (the "2011 Plans").  The Court also stated that it was "inclined to issue an interim remedy only, not a permanent one, and that, under such circumstances the 2011 Plans would be used only for the 2011 elections."  The Court scheduled a hearing on the matter for May 10 and asked the parties to file pre-hearing submissions detailing any evidence they wished present, the relevance of such evidence, and the points they intend to establish.  The Mississippi Republican Party Executive Committee ("Republican Party") responds to the Court's Order as follows:

      1.    For the reasons discussed in the Party's and Governor's joint response to the House Committee Motion [Dkt. 92 at 2-8], the 2011 Plans are not "legislative" plans and may not be treated as such by the Court.  The leaders of both the Mississippi Senate (Lieutenant Governor Phil Bryant) and House of Representatives (Speaker Billy McCoy) recognized prior to the 2011 legislative session, as evidenced by their reported comments to the media, the requirement that any legitimate "legislative" plan must be a jointly enacted plan.  *See* Exhibit 1 (collective).  The plans passed by the respective houses were never enacted by both houses of the Legislature as required by § 254 of the Mississippi Constitution.  The *only* discernible exercise of legislative judgment in this case is the Legislature's *un*willingness to enact the plans.  The plans cannot be used in 2011 elections unless this Court orders the State to use them.  Accordingly, the plans are proposed court-ordered plans.  To the extent necessary to establish this point, Joint Resolution 201 (JR 201), its relevant legislative history, and related resolutions and relevant legislative history, will be submitted as evidence.  *See* Exhibit 2 (note:  versions of JR201 passed separately by the Senate and House are not attached due to length, but can be accessed on the Internet at

http://billstatus.ls.state.ms.us/2011/pdf/history/JR/JR0201.xml and will be presented at the hearing on this matter).

    2.    The 2011 Plans do not satisfy the heightened standard of population equality applicable to court-ordered plans.[1] Moreover, even if the Legislature had enacted the plans, their near-10% deviations would still violate one person, one vote because they do not reflect "an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). Indeed, no party has even attempted to justify the plans' large population disparities based on legitimate redistricting criteria, and the plans do not comply with the redistricting principles established by Mississippi statute. Miss. Code Ann. § 5-3-101. The following evidence will be presented in support of these points:

    a.    Official statistical summaries of the 2011 Plans, which, on their face, show population deviations of 9.96% in the House and 9.60% in the Senate.[2] *See* Exhibits 3 and 4, *available at* http://www.msjrc.state.ms.us/. In addition, in the 2011 House Plan, 69 of the 122 districts have deviations of more than 3% above or below the norm, and 43 districts have deviations of more than 4% above or below the norm. *See* Exhibit 3. In the 2011 Senate Plan, 21 of the 52 districts have deviations of more than 3% above or below the norm, and 14 districts have deviations of more than 4% above or below the norm. *See* Exhibit 4.

---

[1]    *See, e.g.*, *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975); *Connor v. Finch*, 431 U.S. 407, 414-15 (1977); *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1159 (5th Cir. 1981); *Marshall v. Edwards*, 582 F.2d 927, 937-38 (5th Cir. 1978); *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 655, 660 (D.S.C. 2002).

[2]    There were actually two slightly different House plans, neither of which was approved by the Legislature. The parties urging this Court to adopt the un-enacted 2011 plans have not bothered to indicate which of the House plans they are pushing, nor did this Court's April 29 Order indicate which plan it was considering. [*See* Dkt. 96 at 3]

    b. John Diez, President of Magellan Strategies BR, LLC, or one of his associates, will testify that: Based on commonly accepted measures of district compactness, the 2011 Plans are not reasonably compact and unnecessarily decrease the compactness of a number of districts. The plans also unnecessarily split counties, fracturing a number of counties into more districts than are legitimately necessary. The plans also unnecessarily split precincts. [*See* Dkt. 92-2]

    c. Mr. Diaz or one of his associates will also testify that the population deviations in the 2011 Plans are not party-neutral but rather systematically over-populate districts with Republican incumbents and systematically under-populate districts with Democratic incumbents. In addition, Timothy Saler, the Executive Director of the Mississippi Republican Party, will testify that the 2011 Plans exclude at least four known Republican challengers to Democratic incumbents from the districts in which they had qualified to run. [*See* Dkt. 92-3]

  3. The Court should not impose the unconstitutional, un-enacted 2011 Plans as an "interim remedy." Although the nature of the "interim" remedy contemplated by the proponents of the 2011 Plans is unclear, any appropriate and truly "interim" remedy would require legislators to run again in special elections next year. *See, e.g.*, *Watkins v. Mabus*, 771 F. Supp. 789 (S.D. Miss.), *aff'd in part and vacated in part as moot*, 502 U.S. 954 (1991); *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981). It is undisputed that "the 2011 Plans [will] be used only for the 2011 elections" [Dkt. 95 at 2] because § 254 of the Mississippi Constitution *requires* the Legislature to redistrict itself in 2012. If the Legislature fails to do so, then § 254 *requires* that a five-member apportionment commission finalize and redistricting plans in 2012. Accordingly, there is no question that *any* plans adopted by this Court will be used for the 2011 elections only (unless, perhaps, the Legislature or apportionment commission adopt precisely the same plans

next year). The *only* question before this Court is whether to adopt plans that can last until the next scheduled legislative elections in 2015, or to instead adopt the flawed 2011 Plans, which will require special elections next year.

Such additional elections will result in "extra expense for the State, at a time when the court can take judicial notice of extreme budgetary constraints under which Mississippi, like numerous other States, is operating." *Watkins*, 771 F. Supp. at 801. Elections in back-to-back years will also be unnecessarily disruptive of State government and impose an unnecessary hardship on the legislators themselves. Such costs, disruptions, and burdens can be avoided if the Court adopts fair and constitutional plans *now*. The Court's April 29 Order suggests that use of the 2011 Plans "appears to be necessary … because of the exigent circumstances of this case," but the Court should not adopt flawed plans that the Legislature itself refused to enact simply because those plans have been put before the Court. There are no exigent circumstances sufficient to justify such "a massive intrusion into the [State's] legislative process." *Shayer v. Kirkpatrick*, 541 F. Supp. 922, 932 (W.D. Mo. 1982) (three-judge court). Rather, this Court can and should fashion a plan in time for the 2011 elections that satisfies one person, one vote and the Voting Rights Act and follows Mississippi's statutory redistricting principles, Miss. Code Ann. § 5-3-101. In support of this point, the Republican Party proposes its own plans, the details of which are attached as Exhibits 5 through 14 (the "One Percent Plans").[3] Timothy Saler will be available to testify at the May 10 hearing concerning the One Percent Plans. As summarized in the following tables, by virtually every objective measure, the One Percent Plans are significantly superior to the un-enacted 2011 Plans:

---

[3]  Exhibits 5 through 9 reflect the One Percent House Plan. Exhibits 10 through 14 reflect the One Percent Senate Plan. For each, a map, a statistical summary, a summary of the districts, a summary of split precincts, and a summary of the plan's compactness are provided.

|  | **One Percent House Plan** | **2011 House Plan** |
|---|---|---|
| Highest Deviation | 0.99% | 4.98% |
| Lowest Deviation | -0.99% | -4.98% |
| Total Deviation | 1.98% | 9.96% |
| Districts that are 3% or more above or below the norm | 0 | 69 |
| Districts that are 4% or more above or below the norm | 0 | 43 |
| Split precincts | 183 | 193 |
| Split counties | 70 | 72 |
| Compactness (Reock Test) | 0.37 | 0.33 |

|  | **One Percent Senate Plan** | **2011 Senate Plan** |
|---|---|---|
| Highest Deviation | 0.99% | 4.87% |
| Lowest Deviation | -0.99% | -4.73% |
| Total Deviation | 1.98% | 9.60% |
| Districts that are 3% or more above or below the norm | 0 | 21 |
| Districts that are 4% or more above or below the norm | 0 | 14 |
| Split precincts | 44 | 17 |
| Split counties | 53 | 49 |
| Compactness (Reock Test) | .39 | .39 |

The One Percent Plans also comply with § 5 of the Voting Rights Act ("VRA"). The 2002 House plan drew 39 majority-minority districts, 35 of which had a black voting age population of at least 60%. *See* Exhibit 15, *available at* http://www.msjrc.state.ms.us/ms_house.html. Application of the 2010 Census data to the 2002 House plan results in 41 majority-minority districts, 36 of which had a black voting age population of at least 60%. Exhibit A-2 to the Complaint [Dkt. 1]. However, 39 of these 41 districts are under-populated based on 2010 Census data. Indeed, a majority of these districts are under-populated by 10% to 25%, and the total under-population of these districts exceeds 117,000. *See id.* In other words, although application of 2010 Census data to the 2002 plan yields 41 majority-minority districts, those districts are under-populated by the equivalent of nearly *5 districts*. Under these circumstances, "it is relevant to examine how the new plan differs from the benchmark plan as originally enacted by the legislature," *i.e.*, "using the census numbers in effect at the time [it] was passed." *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003), *superseded by statute on other grounds*, Pub. L. 109-246, §§ 2(b)(5) & 5, July 27, 2006, 120 Stat. 580. As the Supreme Court has explained, because a new plan must account for population shifts, "examining the benchmark plan with the census numbers in effect at the time the State enacted its plan comports with the one-person, one-vote principle of *Reynolds v. Sims*, 377 U. S. 533 (1964), and its progeny." *Georgia*, 539 U.S. at 488 n.2.

The One Percent House Plan complies with the VRA by maintaining 40 majority-minority districts, 37 of which have a black voting age population of at least 60%. *See* Exhibit 6. In other words, it creates one more majority-minority district and two more 60% districts than the 2002 plan created. In addition, it creates one more 60% district even when the 2010 Census data are applied to the 2002 plan. Although it creates one less majority-minority district than the 2002 plan with 2010 Census data, that is attributable to the current, significant under-population

of those districts, described just above.  Given that under-population, and given the State's and Court's obligation to comply with *Reynolds v. Sims*, the 2002 plan with 2000 Census data is the more appropriate "benchmark."  *See Georgia*, 539 U.S. at 488 n.2.

The One Percent Senate Plan also complies with § 5 of the VRA.  The 2002 Senate plan drew 12 majority-minority districts, all with a black voting age population of at least 60%.  Exhibit 16, *available at* http://www.msjrc.state.ms.us/ms_senate.html.  The application of 2010 Census data to the 2002 plan yielded one additional majority-minority district with a black voting age population of 50.37%.  Exhibit A-1 to the Complaint [Dkt. 1].  The One Percent Senate Plan also draws 13 majority-minority districts, 12 of which have a black voting age population of at least 60%.  *See* Exhibit 11.  Accordingly, both the One Percent Senate Plan and the One Percent House Plan satisfy § 5's non-"retrogression" principle.  *See United States v. Beer*, 425 U.S.130, 141 (1976) (holding that § 5 prohibits "voting-procedure changes … that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" in comparison to their position under the existing plan).

The One Percent Plans were drawn to (1) maintain districts protected by the non-retrogression principle of § 5 of the VRA, (2) maintain de minimis (+/- 1%) population deviations; and (3) draw districts that are as compact as possible while crossing as few precinct lines and county lines as possible (*see* Miss. Code Ann. § 5-3-101).  In addition, in light of concerns expressed during the April 22 status conference by the intervenor House Committee that a court-drawn would not take adequate account of incumbency, the One Percent Plans were adjusted to avoid pitting incumbents (of both parties) against one another to the extent possible, while still maintaining de minimis population deviations.  The One Percent Plans largely achieve this goal.  Accordingly, while considerations of incumbency should not outweigh the constitutional one-

person, one-vote principle, *see Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985), the One Percent Plans do take account of incumbency to the extent possible and consistent with the Constitution.

4.     Some parties may have objections to the One Percent Plans. That is to be expected, and the Court should consider any such objections and make any adjustments it may deem necessary. The primary point is that the Court does have time to draw plans that, unlike the 2011 Plans, actually respect the one-person, one-vote principle. Testimony at the May 10 hearing before this Court will establish that the One Percent Plans were initially developed over parts of three days, and parts of three additional days were spent making adjustments to minimize incumbency pairings. The Court could make further adjustments to the One Percent Plans, or an independent expert could draw another plan with de minimis deviations in a matter of days. In either case, the Court has time to draw a plan that will not require the State to hold elections again next year.

5.     One final evidentiary point bears mention: The primary argument of the proponents of the 2011 Plans seems to be that those plans' adoption will cause the least disruption to the State electoral process in light of approaching qualifying deadlines. Yet there is *no evidence* to support this contention, and commonsense suggests otherwise. The position of the 2011 plans proponents seems to be based primarily on the hearsay report of the intervenor House Committee's counsel that the Department of Justice ("DOJ") has predicted prompt pre-clearance of the 2011 Plans. However, the DOJ may take up to 60 days to approve or object to a plan. 28 C.F.R. § 51.9. The Court should not impose flawed plans that the Mississippi Legislature refused to enact based on hearsay predictions that a party not before this Court will act more promptly to approve (or reject) those plans than it is required to by law. Instead of passively awaiting a pre-

clearance decision from Washington, this Court should instead act to adopt superior plans that meet the heightened standards applicable to court-ordered plans and that can stand for four years or longer, thereby avoiding the necessity of special elections.

Alternatively, if the Court concludes that an "interim" remedy is truly necessary, then the existing (2002) plans would surely cause less disruption to the electoral process or voter or candidate confusion than the un-enacted 2011 Plans.  Voters and election officials are familiar with existing districts, not the un-enacted plans that this Court is urged to impose, and some candidates who had already qualified in existing districts would be removed from those districts by the un-enacted House plan [*see* Dkt. 96 at 7; *see also* Dkt. 92-3].  Thus, in addition to having been *actually* approved by the Legislature and *already* pre-cleared by DOJ, use of existing districts would be the least disruptive interim remedy available, in the event that an interim remedy becomes necessary.

## CONCLUSION

The Court should adopt the attached One Percent Plans as its remedial plans for 2011 to elect a Legislature for a full four-year term.  Alternatively, applying the principles that the Republican Party and the Governor previously set forth [Dkt Nos. 68, 70 & 92], the Court should fashion its own remedial plan for 2011 to elect a Legislature for a full four-year term.  In no event should this Court order into effect the un-enacted, unconstitutional "2011 Plans."  Instead, if the Court concludes that an interim remedy is truly necessary, it should permit elections to go forward under the legislatively enacted, pre-cleared 2002 plans.

The Republican Party respectfully requests an opportunity to submit the above-described evidence at the May 10 hearing before this Court.

Respectfully submitted, this the 5th day of May, 2011.

                            MISSISSIPPI REPUBLICAN PARTY
                            EXECUTIVE COMMITTEE

                            /s/C. Stevens Seale
                            MICHAEL B. WALLACE (MB No. 6904)
                            mbw@wisecarter.com
                            C. STEVENS SEALE (MB No. 6688)
                            css@wisecarter.com
                            JAMES D. FINDLEY (MB No. 103649)
                            jdf@wisecarter.com
                            WISE CARTER CHILD & CARAWAY
                            Post Office Box 651
                            Jackson MS  39201-0651
                            Telephone: (601) 968-5534
                            Facsimile: (601) 944-7738

**CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent such notification of such filing to the following:

Carroll Rhodes, Esq.
Law Offices of Carroll Rhodes
Post Office Box 588
Hazlehurst, MS 39083-0588

Robert L. Gibbs, Esq.
Matthew W. Allen, Esq.
Brunini Grantham Grower & Hewes
Post Office Drawer 119
Jackson, MS 39205-0119

Samuel L. Begley, Esq.
Begley Law Firm
Post Office Box 287
Jackson, MS 39205-0287

Harold E. Pizzetta, III, Esq.
Justin L. Matheny, Esq.
Office of the Attorney General
Post Office Box 220
Jackson, MS 39205

Robert Bruce McDuff, Esq.
Robert McDuff Law Office
767 N. Congress Street
Jackson, MS 39202-3009

Crystal W. Martin, Esq.
Precious Martin Sr. & Associates
Post Office Box 373
Jackson, MS 39205-0373

R. Andrew Taggart, Jr., Esq.
Clay B. Baldwin, Esq.
Taggart, Rimes & Usry, PLLC
1022 Highland Colony Pkwy, Ste. 101
Ridgeland, MS 39157

John F. Hawkins, Esq.
Hawkins Stracener & Gibson, PLLC
Post Office Box 24627
Jackson, MS 39225-4627

Cory T. Wilson, Esq.
Willoughby Law Group, PLLC
602 Steed Road
Suite 110
Ridgeland, MS  39157

This, the 5th day of May, 2011.

    /s/C. Stevens Seale
    MICHAEL B. WALLACE (MB No. 6904)
    mbw@wisecarter.com
    C. STEVENS SEALE (MB No. 6688)
    css@wisecarter.com
    JAMES D. FINDLEY (MB No. 103649)
    jdf@wisecarter.com
    WISE CARTER CHILD & CARAWAY
    Post Office Box 651
    Jackson MS  39201-0651
    Telephone: (601) 968-5534
    Facsimile: (601) 944-7738